UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORRAINE LOW-IACOVINO,<br><br>Plaintiff,<br><br>v.<br><br>THE BENEFIT PLAN COMMITTEE OF THE NONBARGAINED PROGRAM OF THE A T & T PENSION BENEFIT PLAN,<br><br>Defendant. | Case No. CV 16-6614-AB (GJSx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiff Lorraine Low-Iacovino ("Plaintiff") brings this action under the Employee Retirement Income Security Act ("ERISA") against The Benefit Plan Committee of the Nonbargained Program of the AT&T Pension Benefit Plan ("Defendant"). The case concerns Defendant's denial of Plaintiff's claim for survivor benefits and the waiver of benefits allegedly executed by Plaintiff and her husband, Randy Iacovino. This action came before the Court for trial on December 12, 2017. Mark H. Boykin appeared for Plaintiff. Stacey A. Campbell appeared for Defendant. After considering the evidence in the administrative record, the parties' trial and supplemental briefs, and the arguments of counsel, the Court now enters the following

findings of fact and conclusions of law:

**I.     FINDINGS OF FACT**

1. Randy Iacovino ("Mr. Iacovino") worked for Pacific Bell Telephone and Telegraph Company for approximately 23.5 years, from June 17, 1968 to December 29, 1991.  (AR 000110.)

2. Mr. Iacovino began his employment as a management employee eligible to participate in the Plan for Employees' Pensions, Disability Benefits and Death Benefits, which eventually became the Pacific Telesis Group Pension Plan for Salaried Employees, now known as the Nonbargained Program (the "Plan"), a component of the AT&T Plan.  (AR 000110.)

3. The Plan administrator, AT&T Services, Inc., contracted with Fidelity Workplace Services LLC ("Fidelity") to provide certain services for the Plan, including determination of benefit eligibility and estimation of accrued benefits.  Dkt. No. 52-1, Declaration of Jeremy S. Siegel ("Siegel Decl.") ¶ 4.)

4. Under the Plan, employees are eligible to receive service pension benefits based on their age and years of service.  (*See* AR 000195.)

5. In 1991, a Management Retirement Opportunity ("MRO") opened pension eligibility to participating employees, regardless of their years of service. Mr. Iacovino separated from Pacific Bell under this MRO, making him eligible to receive pension benefits under the Plan.[1]  (*See* AR 000002.)

6. Based on the MRO Minimum Pension benefit formula, Mr. Iacovino was eligible under the Plan to receive a single life annuity ("SLA") pension benefit of $1,591.37 per month.  (AR 0000002, 000320–321.)

---

[1] Mr. Iacovino otherwise would not have been pension-eligible at this time.  As of December 1991, Mr. Iacovino was forty-one years and seven months old, and had a twenty-three year and seven month term of employment.  However, since he terminated his employment under the MRO, he became eligible for an enhanced MRO Minimum Pension.  (AR 000002.)

2.

7. Under the terms of the MRO, Mr. Iacovino was also entitled to a temporary 10% increase to his pension benefit through the time he reached age 62. (AR 000027.)

8. The Plan required an eligible retiring employee to elect whether to receive his pension as a Joint and Survivor annuity or a Single Life annuity. A Joint and Survivor annuity pays reduced amounts during the employee's lifetime and lesser amounts thereafter to a surviving spouse; a SLA pays the full amount of the benefit for the duration of the participant's life only. (AR 000103.)

9. The Plan states that, during the election period, an eligible retiring employee shall elect whether or not to have his pensions paid as a Joint and Survivor annuity. (AR 000103.) The electing employee must describe his spouse by name, date of birth, and address of residence. (*Id.*)

10. If no election is made during the election period, a Joint and Survivor annuity will be deemed elected. (AR 000103.)

11. Where a Joint and Survivor annuity is elected or deemed elected, the amount of the pension is reduced to ninety percent of the SLA amount. (AR 000103; AR 000211.)

12. The Plan states that any election by a married participant not to receive his pension in the form of a Joint and Survivor annuity or any attempt to revoke a Joint and Survivor annuity is not effective unless the participant's spouse consents in writing. (*See* AR 000212.)

13. Mr. Iacovino began receiving pension payments in the amount of $1,750.52 per month, effective December 29, 1991. (AR 000002.) This amount was consistent with the SLA monthly pension payment amount and also reflected the temporary 10% increase which was to be paid until Mr. Iacovino reached age 62. (*Id.*, AR000027.)

14. Mr. Iacovino continued receiving monthly pension payments of $1,750.52 until June 1, 1995, when his payments to $1,768.03 due to a 1% ad hoc increase. (AR 000002.)
15. Mr. Iacovino continued receiving monthly pension payments of $1,768.03 until June 1, 2000, when his payments increased to $1,803.38 due to a 2% ad hoc increase. (AR 000002.)
16. Mr. Iacovino continued receiving monthly pension payments of $1,803.38 until he died on December 11, 2014. (AR 000002.) Mr. Iacovino was 64 years old when he died. (*Id.*)
17. The temporary 10% increase to Mr. Iacovino's monthly pension payments should have ceased once Mr. Iacovino reached age 62. (AR 000002.) However, his payments were not properly adjusted and he continued to receive the enhanced amount until his death in December 2014. (*Id.*)
18. During the thirty-one months between Mr. Iacovino's 62nd birthday and his death, he was overpaid by $5,082.14 due to this error. (AR 000004–005.)
19. The Plan states:

> If any benefit is paid to a Participant, or as applicable Surviving Spouse . . . in any amount that is greater than the amount payable under the terms of the Plan, the Plan will recover the excess benefit amount by eliminating or reducing the Participant's or as applicable Surviving Spouse's . . . future benefit payments. If no further benefits are payable to the Participant or as applicable Surviving Spouse . . . the Plan may employ such means as are available under applicable law to recover the excess benefit amount.

(AR 000098.)
20. Plaintiff is the surviving spouse of Mr. Iacovino. (AR 000019–021.)

21. On December 23, 2014, Fidelity notified Plaintiff that she was not eligible for survivor benefits under the Plan because Mr. Iacovino elected to receive his benefits in the form of a SLA. (AR 000036, 000039.)
22. Plaintiff subsequently asked Fidelity for documentation of Mr. Iacovino's pension benefit election forms and for documents showing Mr. Iacovino elected to receive his pension benefits in the form of a SLA. (AR 000045, 000019–020.)
23. Fidelity did not have Mr. Iacovino's records from the time of his retirement. (AR 000003.) When Fidelity assumed its administrative role for the Plan administrator, the Plan decided not to transfer historic records from the prior administrator for Plan participants who were then receiving pension benefits. (Siegel Decl. ¶ 6.)
24. Fidelity analyzed the Plan and the payment history of Mr. Iacovino's pension and determined, based on that information, that Mr. Iacovino had elected a SLA. Accordingly, Fidelity found that no survivor payments were due to Plaintiff under the terms of the Plan. (AR 000003; 000022.) In a February 10, 2015 letter, Fidelity advised Plaintiff that no surviving benefits were due to her under the Plan. (AR 000022.)
25. On March 13, 2015, Plaintiff made a claim for survivor benefits, arguing that she did not waive her right to such benefits. (AR 000019–020.)
26. Fidelity again analyzed the Plan terms and considered the payments received by Mr. Iacovino. (AR 000024–039.) Fidelity confirmed that the amount paid to Mr. Iacovino was consistent with the benefits due under a SLA. (AR 000025–030.) Fidelity also determined that Mr. Iacovino's monthly payments would have been approximately 10% lower had he elected a Joint and Survivor annuity.[2] (*Id.* at 000030.) Fidelity also

---

[2] Based on the Plan's terms, Mr. Iacovino received approximately $47,064.21 more

considered Mr. Iacovino's Master File document—a computer printout of information related to Mr. Iacovino's pension benefits—and found that Plaintiff was not listed as a surviving spouse. (AR 000030; AR 000104[3].) For these reasons, Fidelity denied Plaintiff's claim. (AR 000024–032.)

27. On June 4, 2015, Plaintiff appealed Fidelity's denial of her claim. (AR 000033–035.) In her appeal Plaintiff again disputed having waived her right to a joint and survivor benefit and requested to have the $5,082.14 overpayment waived. (*Id.*)

28. The Benefit Plan Committee considers appeals of benefit denial decisions under the Plan. (AR 000149.)

29. On September 25, 2015, the Benefit Plan Committee affirmed Fidelity's denial of Plaintiff's claim. (AR 000106–113.) The Benefit Plan Committee considered the applicable pension formulas and determined that Mr. Iacovino received his pension benefit as a SLA for the entire period in which he received benefits. (AR 000113.)

30. Plaintiff filed the instant action on September 1, 2016. (Dkt. No. 1.)

## II. CONCLUSIONS OF LAW

### 1. Jurisdiction and Venue

This action involves a claim for survivor benefits under an employee pension benefit plan that is subject to ERISA. Accordingly, the Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). Venue in the United States District Court for the Central District of California is appropriate under 29 U.S.C. § 1132(e)(2) because the acts that gave rise to this lawsuit took place in this

---

than he would have received had he been paid at the Joint and Survivor rate. (Siegel Decl. ¶ 8.)

[3] This document purports to be the computer printout of Mr. Iacovino's Master File; however, the Court is unable to verify the contents of the document due to the poor quality of the scan. (*See* AR 000104.)

district, and Plaintiff and counterdefendant is domiciled in this district.

**2. Standard of Review**

Plaintiff seeks recovery of benefits under 29 U.S.C. § 1132(a)(1)(B), an award of equitable relief "absolving her from liability for overpayment" to Mr. Iacovino, and attorneys' fees. (Dkt. No. 1 ("Compl.") at 6.) A claim of denial of benefits in an ERISA case "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009). If the plan confers such discretion, then the denial is reviewed for an abuse of discretion. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 110–11 (2008). The Court is unpersuaded by Plaintiff's brief argument that a de novo standard applies in this case. Here, the Plan delegates discretion and authority to decide benefit claims to the Plan Administrator, AT&T Services, which in turn delegates its powers to Fidelity and the Benefit Plan Committee. (AR 000152; Siegel Decl. ¶ 4.)

Under an abuse of discretion review, the dispositive issue is whether the denial of benefits was reasonable. *Firestone*, 489 U.S. at 111; *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011). A plan administrator's decision was unreasonable if it "was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts of the record." *Salomaa*, 642 F.3d at 676. If the Court is "left with a definite and firm conviction that [such] a mistake has been committed," it must find that the plan administrator abused its discretion. *Id.* at 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)).

**3. Discussion**

At the center of the dispute is a purported waiver of Joint and Survivor annuity pension benefits pursuant to ERISA. In order for a married participant to waive the

7.

joint and survivor annuity form of benefit, he must obtain his spouse's consent in a signed and notarized writing. 29 U.S.C. § 1055(c)(2). Defendant contends that Plaintiff and her husband must have waived the joint and survivor annuity option because Mr. Iacovino was ultimately paid the SLA benefit amount. In other words, the Plan would not have paid Mr. Iacovino SLA benefits if he had not submitted a proper waiver form. Further, Defendant argues that Plaintiff's name would have appeared under the surviving spouses section of Mr. Iacovino's master file if he had elected a Joint and Survivor annuity; since Plaintiff's name is not there, Mr. Iacovino must not have elected the Joint and Survivor option. Plaintiff argues that she never signed a waiver, and that it was an abuse of discretion for the Plan to deny her claim without proof of a valid waiver.

Despite its research, the Court was unable to uncover a case with similar facts, i.e., a case where the alleged waiver form was not available. Typically, the waiver form is produced to support the Plan's denial of a claim, and the plaintiff challenges the waiver form as failing to comply with § 1055(c)(2). "Under ERISA, waiver of the qualified joint and survivor annuity, the standard form of payment from a defined benefit plan to a participant before death, is invalid unless it satisfies the rigorous rules in § 1055(c)." *Rice v. Rochester Laborers' Annuity Fund*, 888 F. Supp. 494, 498 (W.D.N.Y. 1995) (quoting *Lester v. Reagan Equip. Co. Profit Sharing Plan & Empl. Savings Plan*, No. 91-2946, 1992 WL 211611, at *5 (E.D. La. Aug. 19, 1992)). Accordingly, ERISA's waiver requirements call for strict compliance. *Neidich v. Estate of Neidich*, 222 F. Supp. 2d 357, 366 (S.D.N.Y. 2002); *see also McMillan v. Parrott*, 913 F.2d 310 (6th Cir. 1990).

In *Hagwood v. Newton*, 282 F.3d 485 (4th Cir. 2002), the court explained the necessity for strict construction of an alleged spousal waiver as follows:

> The spousal rights conferred by § 1055(a) were intended to "ensure a stream of income to surviving spouses," *Boggs*, 520 U.S. at 843, 117 S. Ct. 1754, 138 L.

> Ed. 2d 45, and the formalities required in § 1055(c) are included *to protect against the risks of a spouse's unwitting waiver of those rights*, *Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 867 (11th Cir. 1997) (noting that formalities are necessary "to ensure a valid waiver of a spouse's retirement plan [and] are consistent with the legislative policy of protecting spousal rights"). ERISA's formalities must, therefore, be strictly enforced. In *Lasche*, for example, the court held that a waiver was invalid under § 1055 simply because the signatures had not been witnessed by a notary as required by that section.

*Hagwood*, 282 F.3d at 290 (emphasis added).

Here, the Court is unable to determine whether a waiver form exists at all, let alone whether it strictly complied with the rules in § 1055(c)(2). Defendant asserts that it was never in possession of the form, and "has no way to access historical pension records for Mr. Iacovino or even to determine if such records still exist." First, the Court is unpersuaded by this argument. With respect to an employer's recordkeeping obligations, ERISA requires employers "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C § 1059(a)(1). This provision further states that an "employer shall furnish to the plan administrator the information necessary" for the administrator to make certain reports concerning employee benefits. *Id.* Based on these requirements, Plaintiff's waiver likely exists in AT&T's records, and Fidelity could have at least requested it in order to help determine Plaintiff's benefits under the plan. Although Plaintiff is not suing under § 1059 for failure to maintain required records, this provision reveals a plan administrator's ability to access such documents.

Instead, it appears Fidelity made absolutely no attempt to retrieve Plaintiff's waiver form. At a minimum, Fidelity could have called AT&T Services to inquire into the situation, and could have discovered whether the form existed and how they

9.

could gain access to it. Other courts have held that similar conduct was inconsistent with a plan administrator's fiduciary duties. In *Lombardo*, the plaintiff submitted a claim for benefits, which was denied by the plan committee. The plaintiff argued that her signature had been forged by her husband, but the committee denied her claim without inquiring into the validity of the consent form. The court there stated that "[o]nce the Committee was notified of a claimed forgery, they had a duty to at least inquire as to the validity of the notarized spouse consent form. A plan administrator cannot ignore obvious warning signs that suggest an obligation to inquire." The Court continued that "[u]nder the circumstances, they may not have been able to determine anything further concerning the signature on the spouse consent form. On the other hand, they might have uncovered information explaining the circumstances surrounding Mr. Lombardo's change of beneficiary or they may have been able to substantiate or disprove Mrs. Lombardo's claim that her signature had been forged. Instead, however, it appears from the record before the court on these motions for summary judgment that they chose to do nothing." 1997 WL 289669, at * 6. *See also Lester v. Reagan Equip. Co. Profit Sharing Plan & Emp. Sav. Plan*, No. 91–2946, 1992 WL 211611, at * 6–7 (E.D. La. Aug. 19, 1992) (finding an administrator abused its discretion when it "simply accepted, without further questioning or investigation, Mr. Lester's unverified statement that his wife could not be located").

Like the committee in *Lombardo*, Fidelity did nothing when put on notice of Plaintiff's allegation that she did not sign—and her husband would not have signed—a waiver form. Instead, they merely relied on a history of payments made to Mr. Iacovino at the SLA rate, without any verification that the payments were issued based on a valid Joint and Survivor annuity waiver. Fidelity presented no evidence with respect to how such waivers are processed and inputted, and it does not appear that Fidelity or the Plan Committee considered these methods when making their determinations. Based on the information in the record, it is just as likely that an error

was made when inputting Mr. Iacovino's information as it is that the Iacovino's elected to waive Joint and Survivor annuity.

Further, the Court is unpersuaded by Defendant's argument that Mr. Iacovino must have elected a SLA because Plaintiff's name does not appear on his master file. The default option for the Plan is a Joint and Survivor Annuity; thus, if a married participant makes no selection during the election period, he is automatically enrolled in a Joint and Survivor Annuity. It is not clear from the record that any spouse information would have been provided if a participant made no election. Thus, the Court cannot find that Mr. Iacovino affirmatively elected to receive his benefits in the form of a SLA simply because Plaintiff's name does not appear in his master file. Although the Court is troubled by this situation, it finds that Fidelity did not act prudently when it denied Plaintiff's claim. Fidelity owed Plaintiff a fiduciary duty to act according to her interest, *see* 29 U.S.C. § 1104 (a plan administrator must discharge his duties "solely in the interest of the participants and beneficiaries"); when she claimed that no waiver was executed, Fidelity should have, at a minimum, made a phone call to AT&T regarding Mr. Iacovino's historical records. Even if ultimately they were unable to recover the records, they could have gained information regarding the intake process to help support their arguments that they would not have paid a SLA rate without a valid waiver. Given the highest of fiduciary duties that were owed to Plaintiff, the Court holds that Fidelity and the Plan Committee had a duty to at least inquire. Accordingly, the Court finds that Defendant abused its discretion in denying Plaintiff's claim. *See also Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 499 (8th Cir.1989) ("A decisionmaker can abuse its discretion if it fails to obtain necessary information, without which an administrator lacks substantial evidence to support his or her decision."); *Ritzer v. National Org. of Indus. Trade Unions Ins. Trust Fund Hosp. Medical Surgical Health Benefit*, 807 F. Supp. 257, 262 (E.D.N.Y. 1992) ("An administrator also can abuse his or her

11.

discretion where the administrator's decision to deny benefits is based on little or no probative evidence establishing a fact central to the decision.").

### 4. SLA Overpayment Offset

ERISA contains a limited safe harbor provision for plan administrators who comply with the statutory requirements. The statute provides that the plan will be discharged from liability "to the extent of payments made pursuant to the Act," if the plan administrator determines that the statutory requirements have been met and if the plan administrator acts in accordance with his fiduciary obligations. 29 U.S.C. § 1055(c)(6).

In *Lombardo*, the court authorized an offset where the plan administrator relied on a facially valid waiver when it authorized SLA payments. 1997 WL 289669, at *4. There, the court held there was an issue of fact as to whether the waiver was forged or had a notarization defect. However, because the alleged defects were not obvious from the face of the document, the court held that the plan administrator was entitled to offset overpayments made to the plaintiff under section 1055(c)(6). *Id.* at *4, *7. Therefore, the plan would only be liable to the plaintiff "if its debt to her exceeds its overpayments to her late husband." *Id.* at *7; *see also Hearn v. Western Conference of Teamsters Pension Tr. Fund*, 68 F.3d 301, 304 (9th Cir. 1995) ("Mr. Hearn received a total of $3,096 in benefits over the course of nine months. Had he selected the joint and survivor annuity, he would have gotten only $1,399.50. The difference—$1,696.50—is the amount by which the Plan is discharged from liability. Had Mr. Hearn not waived the joint and survivor annuity, Mrs. Hearn would have been entitled to receive $78 per month beginning in October of 1991 (one month after Mr. Hearn died). The Trust Fund wasn't obligated to make payments to Mrs. Hearn until it offset the $1,696.50 it overpaid Mr. Hearn. Thus, the Trust Fund was entitled to withhold benefits from Mrs. Hearn for a period of approximately 22 months, until July of 1993. It was obligated to pay her $78 per month thereafter."); *Blessing v.*

*Deere & Co.*, 985 F. Supp. 886, 893–94 (S.D. Iowa 1997) (holding a pension plan is discharged from liability to a surviving spouse only to the extent it made payments under the plan to the deceased spouse; the plan remains liable to the surviving spouse to the extent its debt to the surviving spouse exceeds its overpayments to the deceased).

Again, this case presents the Court with another difficult decision. It is unclear whether plan administrator relied on a facially valid waiver in authorizing Mr. Iacovino to receive SLA pension payments. Defendant argues that it would not have paid the higher SLA amount without a valid waiver; but again, this is a conclusory and unsupported contention. Given ERISA's clear goal of protecting surviving spouses, the Court is uncomfortable accepting this bare assertion where there is no proof of compliance with section 1055. On the other hand, the Court recognizes that this could result in a windfall for Plaintiff, who may have signed a waiver after all, yet gets to reap the benefit of Fidelity's lack of effort to produce the document. However, the Court found above that Fidelity did not act in accordance with its fiduciary duties to Plaintiff, and should have attempted to locate the alleged waiver. Therefore, because Fidelity did not act in accordance with its fiduciary obligations, the Court finds the Plan is not entitled to offset the overpayments made to Mr. Iacovino. Fidelity was in the best position to avoid this outcome—a small amount of effort on its part could have shown it was entitled to an offset.

**5. Temporary 10% Enhancement Overpayment**

As noted in the Findings of Fact, the Plan overpaid Mr. Iacovino by $5,082.14 when it erroneously continued to pay him at an increased rate after his 62nd birthday. (AR 000004–005.) Based on the Plan's terms, the Plan is entitled to recover such overpayments:

> If any benefit is paid to a Participant, or as applicable Surviving Spouse . . . in any amount that is greater than the amount payable under the terms of the Plan,

the Plan will recover the excess benefit amount by eliminating or reducing the
Participant's or as applicable Surviving Spouse's . . . future benefit payments.
If no further benefits are payable to the Participant or as applicable Surviving
Spouse . . . the Plan may employ such means as are available under applicable
law to recover the excess benefit amount.

(AR 000098.) Accordingly, the Court finds the Plan shall recover $5,082.14. Defendant is entitled to withhold Plaintiff's survivor payments until it recovers this amount.

### III. CONCLUSION

Based on the foregoing analysis, the Court finds that Defendant abused its discretion when it denied Plaintiff's claim. The Court also finds that Defendant is not entitled to offset the $47,064.21 it overpaid Mr. Iacovino during his lifetime, but is entitled to recover the $5,082.14 it overpaid Mr. Iacovino based on the failure to terminate his 10% increase after he reached age 62.

The Court reserves ruling on Plaintiff's request for attorneys' fees to allow Defendant an opportunity to present argument on that issue. Defendant shall submit any briefing on the issue within twenty-one (21) days of the issuance of this order.

**IT IS SO ORDERED.**

Dated: December 20, 2017

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

14.